MARY CODDINGTON et al.

*v.*

AMELIA JENNER et al.

[Submitted December 3d, 1897. Filed December 2d, 1898.]

The execution and contents of a lost will may be established by evidence *aliunde,* but the proof must be clear and convincing.

On bill, &c. Heard on bill, answer, replication and proofs taken orally.

*Mr. John A. Frech* and *Mr. Richard V. Lindabury,* for the complainants.

*Mr. Nelson Runyon* and *Mr. Craig A. Marsh,* for the defendants.

EMERY, V. C.

This is a bill to establish a will of real and personal estate alleged to have been duly executed by one Mrs. Ann E. Martin and to have been accidentally destroyed by fire previous to her death, without her knowledge and without having been revoked. Ann E. Martin died on June 16th, 1894, seized of a tract of

land in Somerset county, containing about nineteen acres, worth, with the house thereon, about $2,000, and possessed of a personal estate of more than $5,000. She was about seventy-nine years of age at the time of her death, and left surviving, her husband, Peter Martin, and three children, viz., the complainant, Mary Coddington, wife of William H. Coddington; Amelia Jenner, wife of Philip Jenner, and Adrian Martin. These children were all born out of lawful wedlock, the marriage of Peter and Ann E. Martin having taken place on November 26th, 1869, as now appears by the marriage certificate put in evidence. On August 4th, 1894, administration upon the personal estate of Mrs. Martin, as an intestate, was granted to Adrian Martin, Philip Jenner and Franklin P. Coddington, who have settled the estate and now hold the balance ($5,102.01) in their hands for distribution. The orphans court of Somerset county, by order dated May 21st, 1896, directed the payment of this sum to Peter Martin, the husband. The bill is filed to restrain this payment by the administrators and to establish a will alleged to have been made by Mrs. Martin in 1890, a draft or copy of which is set out in the bill. By this alleged will the testatrix, after directing the erection of a monument and dividing her jewelry and clothing between her two daughters and directing "that the father of two of her children, Peter Martin," shall have the use of her household furniture for life and then bequeathing it to her son, Adrian, devises and bequeaths all her property, real and personal, to her three children, share and share alike. Nothing is given to the husband except the use of the furniture. Joel Coddington, a grandson, is made executor with authority to sell the estate. The present bill is filed by Mary Coddington, one of the daughters, and her husband against Mrs. Jenner and her husband, Adrian Martin and his wife, Peter Martin and against the administrators of Ann E. Martin, and Joel Coddington, the executor named in the alleged will. For the proof of the actual execution of the will, complainants rely upon the testimony of three witnesses, John K. Van Ness and William H. Clum (the two witnesses to the will), and John P. Cowles, who says that he engrossed the will in question from

34

a draft made by Van Ness and delivered the engrossed will to Van Ness. This original draft, a paper in pencil, is now produced and identified by Van Ness, and probate of the will according to this draft is prayed. The pencil draft is still legible (except, perhaps, as to the date of the year in figures), and is complete with the exception of the blanks for dates and the signatures. Defendants claim that the credibility of these witnesses has been so shaken that their evidence is not sufficient to establish the will, and especially that the general reputation for truth of Van Ness, the principal witness to the execution and contents of the will, has been successfully attacked. Both complainants and defendants have produced evidence of declarations made by Mrs. Martin relating to her will and her intentions as to her estate, before as well as after the date of the alleged will and up to within a short time preceding her death. The question in the case as presented on the hearing is one of fact purely. The rule of law applicable to the decision of the case upon the evidence is the one stated by Chancellor Green in *Wyckoff* v. *Wyckoff, 1 C. E. Gr. 401 (1863)*, and is (at *p. 405*) " that the will may be established upon *satisfactory* proof of the destruction of the instrument and of its contents and substance. Whether the proof be by one witness or by many, it must be clear, satisfactory and convincing."

This rule was declared in a case where the execution and the destruction of the will were not contested, and the question was as to the proof of the contents, but the same principle is applicable as well to the points of execution and loss as of contents. All three points are here disputed, and the direct evidence as to all three points is to some extent connected.

John K. Van Ness was an attorney, about forty-five years of age, who had been practicing in New York since 1875, but who came from Mrs. Martin's neighborhood and knew her from his youth. He transacted some business for New Jersey clients, and in the early spring of 1890 was building a residence at Plainfield, to which he removed in June of that year. Without going into full details of his testimony, it may be said that his testimony, if believed, establishes the following facts as to the

actual execution of a will: A will was drawn for Mrs. Martin, under Van Ness' instructions from oral directions given to him by Mrs. Martin in the summer of 1889, and a letter from her received by him in January, 1890. The will was drawn by a Mr. Cowles, a New York lawyer, then in Van Ness' office, from a pencil draft in Van Ness' handwriting, made by Van Ness on the day previous to the execution of the will, and which is now produced and identified by Van Ness. The will was executed by Mrs. Martin at the City Hotel in Plainfield, where she met Van Ness by appointment for that purpose. Previous to the execution the will was compared with the draft by Van Ness and found to be a correct copy of it, and the will was read over by Mrs. Martin and was also read to her by Van Ness. Cowles, who had brought the will and draft to Plainfield and delivered them to Van Ness on that day, was at the City Hotel and conversed there with Mrs. Martin. The will was executed in the presence of Van Ness, and a Mr. William H. Clum, an architect of Plainfield, and an acquaintance of Van Ness, who was requested by the latter to witness the will. The legal forms of execution were duly complied with. As to the execution of the paper, Clum's evidence establishes that, at the request of Van Ness, who met him casually on the street near the City Hotel, he consented to witness the execution of a paper with Van Ness, and for that purpose accompanied Van Ness to the parlor of the hotel, where the will was signed by the testatrix in his presence and in that of Van Ness, and they both witnessed its execution as her will at the request of the testatrix. The paper was not read in his presence. Clum had never seen this lady before, but she was an old lady, who was introduced to him by Van Ness as Mrs. Martin, and to the will she signed the name "Ann E. Martin." Clum further says that after the execution of the will and in reply to Van Ness' inquiry as to what he should do with the will, Mrs. Martin directed Van Ness to keep it, and said that she did not want the wife of her son (with whom she was living) to know that she had made a will. When Clum left the room, shortly after the execution of the will, it was lying upon the table, and Van Ness and Mrs.

Martin were there. The time of the execution of the will Mr. Clum now fixes as in February or March, 1890.

I find nothing in the evidence to shake Clum's credibility as to these substantial facts.

Mr. Cowles, the third witness on the point of the execution of the will, testifies that in 1890, and as he recollects, between the latter part of January and the first of March, he drew or engrossed a will from a pencill draft given to him by Van Ness, and at his request took the will to Van Ness, at the City Hotel in Plainfield, the next day. He delivered these papers to Van Ness at this place at the time appointed, and he there saw an elderly lady introduced to him as Mrs. Martin by Van Ness, and to whom he was introduced as the gentleman who drew the will. He was present when Mr. Clum came into the parlor, but left shortly afterward and before the actual execution of the will. Van Ness returned to him at Plainfield the pencil draft, and he (Cowles) returned this to Van Ness at his office in New York a day or two afterward.

The witness, on cross-examination, being asked whom he met that day in Plainfield, stated that he thought he met a Mr. Holcomb, and being then questioned as to what occurred in meeting Holcomb, gave the details of the meeting.

It appeared by the subsequent examination of Holcomb that in March, 1890, and for some time before and after, he was not then living in Plainfield, but in California. He had, however, met Cowles in Plainfield previous to 1890, and two or three times. It was urgently insisted that the credibility of Cowles was entirely destroyed by reason of his detailed statements as to meeting Holcomb on that day, and their falsity. I cannot consent to this view of his evidence. The witness was mistaken if the evidence as given warrants the conclusion that he intended to assert positively that this day in March, 1890, was the day on which he met Holcomb, but as he certainly met Holcomb in Plainfield previous to the day named, I see no reason for holding that his entire story of the drafting and execution of this will is a fabrication because of a mistake on this collateral fact. H's testimony, when he declines to identify the draft now

produced as the one from which he engrossed the will, is an indication of his fairness and honesty, and I see no sufficient reason to reject his evidence. Van Ness' general character for truth and veracity has been attacked by witnesses who knew his general reputation and has been seriously shaken, and in the absence of corroboration as to the execution of the will, his evidence might not be considered sufficient to establish it. But, corroborated as his evidence is by the evidence of Clum and of Cowles, and in the absence of any apparent motive or interest on Van Ness' part to fabricate this will, the evidence in this case as to the execution of a will is satisfactory. As to the subsequent custody of the will, the evidence of Clum corroborates that of Van Ness as to Mrs. Martin's direction that he should keep the will. The loss of the will by reason of its being taken to Van Ness' house in Plainfield, which was burned in July, 1893, is proved solely by Van Ness' testimony, and the reliance on his statements upon this point is shaken by the fact that when the death of Mrs. Martin was first called to his attention, in March, 1896, by a notice in the newspaper of the settlement of her estate, he wrote or dictated a letter to the surrogate, from which it would seem that he then thought he had the will in his possession. This is somewhat explained by his physical and mental condition since the fall of 1895, when he was stricken with paralysis, but if the establishment of the will depended on certain proof of the manner and circumstances of the loss or destruction, his evidence might not be entirely satisfactory on this point. But, as it seems to me, the questions upon this branch of the case are, first, whether the will was executed; second, whether it was delivered to Van Ness for custody by the testatrix after execution; and third, whether it has since and before testatrix's death been destroyed or lost, and without the knowledge of the testatrix. As to the execution and custody, Van Ness' evidence is sufficiently corroborated, and if this will was so executed and delivered to Van Ness, his statements alone are, I think, sufficient to establish the subsequent loss or disappearance of the will and his failure to notify the testatrix. Corroboration in reference to these matters, which were almost, if not entirely, within

the sole personal knowledge of Van Ness, cannot reasonably be required of those who claim under a will which has been satisfactorily shown to have been delivered to him by the testatrix after execution. The same considerations apply to some extent to the evidence of Van Ness as to the contents of the will. He produces the draft, and he alone proves the draft to have been the one delivered to Cowles to copy, and that the will was correctly copied from it. He is corroborated by Cowles as to the existence of an original draft in his handwriting from which the will was copied, and as to the subsequent return of this draft to him by Cowles, and the paper itself bears some evidence of authenticity and purpose. It appears to be just what a paper drawn at the time and for the purposes sworn to might be. The evidence of these witnesses taken together is, in my judgment, sufficient to establish the will according to the tenor of this draft now produced. Considerable evidence was given upon both sides as to the declaration of the testatrix in reference to her execution of a will, the declarations being made both before and after the alleged execution of the will. I have read and considered this evidence, but find nothing in the statements of testatrix sufficient to outweigh the positive evidence as to the actual execution of the will at some time during the spring of 1890. And if the desire of the testatrix to conceal the existence of a will, which she expressed at the time of the execution of the will, continued up to the time of her death, the effect of her declarations as to its existence loses much of its effect.

A decree will therefore be advised establishing the will as prayed and enjoining the distribution of the estate of testatrix as that of an intestate.